UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
LAFAYETTE DIVISION

| | | |
|---|---|---|
| BETH ANN CARROLL,       )    |   | |
|      Plaintiff,                )    |   | |
|                                                   )    |   | |
| v.                                              )    | Cause No. 4:06-CV-144-PPS-APR | |
|                                                   )    |   | |
| MICHAEL J. ASTRUE,           )    |   | |
| COMMISSIONER OF SOCIAL  )    |   | |
| SECURITY,                       )    |   | |
|      Defendant.              )    |   | |

**OPINION AND ORDER**

Plaintiff, Beth Ann Carroll, seeks social security disability benefits claiming she is disabled. But an administrative law judge disagreed finding that Ms. Carroll retains the capacity to perform work in approximately 26,000 jobs existing within the Indiana economy. She is now challenging that decision but because it is supported by substantial evidence, it is affirmed.

**I. Factual Background**

Ms. Carroll was born on August 18, 1963. She left school in the tenth grade (Tr. 14, 914). Her past relevant work experience consists only of working as a service station cashier (Tr. 14, 935). Ms. Carroll claims she is unable to work because of chronic obstructive pulmonary disease, asthma, back pain, chronic pain syndrome, anxiety, and high blood pressure (Tr. 118). The medical evidence in the record dates back to March 2002, when Ms. Carroll sought medical treatment for back pain (Tr. 162). Ms. Carroll has accumulated a substantial medical record covering a wide range of complaints, impairments, and procedures.

On February 28, 2003, Ms. Carroll visited Dr. David R. Emery to evaluate her chronic obstructive pulmonary disease ("COPD") and bronchitis (Tr. 415-16). Dr. Emery counseled Ms. Carroll on ways to reduce her airway inflammation (Tr. 416). For starters, she smokes 2-3 packs

of cigarettes per day (Tr. 871). So Dr. Emery advised Ms. Carroll and her husband to quit smoking in order to alleviate the COPD and bronchitis difficulties (Tr. 416). Dr. Emery repeated this admonition often (Tr. 409, 225, 669, 809).

In June 2003, Ms. Carroll was examined by Dr. Jesse Z. Li (Tr. 304-05). Ms. Carroll complained of back pains and muscle spasms in the legs (Tr. 304). Yet the examination resulted in the identification of no significant clinical abnormalities (Tr. 304-305). All the same, Dr. Li recommended further diagnostic testing to evaluate other possible conditions such as myopathy (Tr. 305), but the results of the testing were "essentially normal" (Tr. 296). Dr. Li also ruled out the possibility of multiple sclerosis as the cause of the complained of impairments (Tr. 292).

At approximately the same time as these diagnostic tests were being performed, Ms. Carroll was examined by Dr. James A. Kenny, Ph.D. Clinical Psychology, at the request of the Indiana Disability Determination Bureau (Tr. 356-57). Unlike her previous physical examinations, the examination by Dr. Kenny was intended to determine whether Ms. Carroll had any psychological impairments. During the examination, Ms. Carroll indicated that she had been hospitalized eight times in the past five years and presented Dr. Kenny a list of seventeen different medications she was currently taking (Tr. 356). More on that in a moment.

Ms. Carroll's chief complaints to Dr. Kenny included an inability to breathe, back pain, and body spasms (Tr. 356). She also identified stress, derived from the care of her mentally handicapped brother, as a limiting impairment (Tr. 356). Ms. Carroll indicated to Dr. Kenny that her typical day consisted of waking up around 6:30 a.m., drinking coffee, listening to the radio, watching television, attending doctors' appointments, playing with her cat, and possibly going shopping (Tr. 356). Ms. Carroll claimed to be unable to do housework or lawn work (Tr. 356).

Dr. Kenny noted in his examination that Ms. Carroll was "oriented to time, place, person, and reality, with no overt psychotic signs" (Tr. 357). Dr. Kenny further noted that her serial 7's were completed at a moderate pace without error (Tr. 357). Dr. Kenny, without further explanation, diagnosed a pain disorder and an adjustment disorder with depression (Tr. 357).

Following Dr. Kenny's examination, Dr. Gange, Ph.D., reviewed Ms. Carroll's records for the State agency and completed a "Psychiatric Review Technique" form in August 2003 (Tr. 341-54). Dr. Gange opined that Ms. Carroll did not appear to have any significantly limiting mental health impairment (Tr. 353). In October 2003, Dr. J. Evans, Ph.D., reviewed the findings of Dr. Gange and affirmed the psychiatric review (Tr. 353).

In the latter part of 2003, Ms. Carroll was referred by her family physician, Dr. Marianne Nelson, to Dr. Anita Conte for further treatment of her back pains (Tr. 212). Upon examination Dr. Conte noted no significant abnormalities, but recognized chronic back pain as an ongoing ailment (Tr. 212). On January 9, 2004, Dr. Conte noted that Ms. Carroll appeared to be stable on her current healthcare regimen (Tr. 189). A few days later, Dr. Conte noted discussing with Ms. Carroll a concern regarding addictive behavior exhibited by Ms. Carroll (Tr. 188). Dr. Conte wanted Ms. Carroll to focus on "non-pharmaceutical measures to manage pain – including weight loss and exercise" (Tr. 188).

This recommendation fell on deaf ears. On January 26, 2004, Ms. Carroll returned to Dr. Nelson for further examination (Tr. 177). At that appointment, Dr. Nelson noted that Ms. Carroll "refuses to stop pain meds!!" (Tr. 179). She also noted that she refused to discontinue using oxygen even though she didn't need it (Tr. 181). While Dr. Nelson recognized some physical limitations, she believed that Ms. Carroll could engage in relatively normal activity (Tr.

3

180).

In February 2004, Dr. Carolyn G. Kochert examined Ms. Carroll upon referral from Dr. Nelson (Tr. 144).  Dr. Kochert examined Ms. Carroll for complaints of low back pain extending into the right hip, groin, and into the calf (Tr. 144).  Dr. Kochert recommended steroid injections, continued medication, and encouraged a home exercise program (Tr. 145).  Thereafter, Ms. Carroll underwent epidural steroid injections for her pain (Tr. 138-39, 158-59).

In light of the note from Dr. Nelson – that Ms. Carroll "refuses to stop pain meds!" – it's worth pausing here to discuss the depths of Ms. Carroll's drug use.  Ms. Carroll was on methadone, Morphine, Demerol, Clonadine, Xanax, Zanaflex, Flexeril, "lots of Vicodine" and a host of other pain killers and medications – in fact, 17 in all (Tr. 20, 356).  She obtained her prescriptions from a variety of doctors who initially would comply with her request but then would refuse to write refills, and then she would move on to other doctors. (Tr. 20-21).  In July, 2003, Carroll went so far as to enter a hospital emergency room "screaming in pain" until she was given pain killers (Tr. 20).  One doctor recognized her profound problem and wrote that "[w]e need to sit down and try and devise a strategy for weaning her off her narcotics."  (Tr. 21).

During the administrative hearing, Ms. Carroll testified that she suffers from breathing problems, back spasms, and overall general discomfort (Tr. 921-22).  Ms. Carroll said that she is unable to lift more than eight pounds, lacks the ability to walk any significant distance, must constantly shift between standing and sitting, and suffers from constant pain (Tr. 920-21), although it was relieved by the steroid injections (Tr. 922).  Ms. Carroll further testified that she has difficulty maintaining her balance, cooking, sleeping, seeing, bathing, and getting dressed (Tr. 926-929).

The ALJ largely discounted Ms. Carroll's testimony finding that she was not credible, and he well supported his skepticism (Tr. 21). The ALJ noted that Carroll is a drug abuser who lies or exaggerates her complaints to doctors in order to get them to write her prescriptions (Tr. 21). The ALJ further pointed to the episode of Ms. Carroll screaming in pain in an emergency room to get drugs as evidence of her utter lack of credibility (Tr. 21). The ALJ found that she lied to a doctor about having multiple sclerosis; she lied again about having emphysema; and she testified at the hearing that she was blind in her left eye when evidently she is not (Tr. 21).

As for her psychological disorder, Dr. David Jarmon, a psychologist, testified at the administrative hearing that he reviewed the record and was present throughout Ms. Carroll's testimony (Tr. 936). Dr. Jarmon explained that there was little indication of psychological problems in the record (Tr. 937). He testified that he found nothing in the record, with regard to psychological impairment, that would preclude Ms. Carroll from performing unskilled work (Tr. 938). Dr. Jarmon also stated that he did not believe psychological problems were a primary concern in this case (Tr. 938). Lastly, in response to counsel's questions, Dr. Jarmon testified that no formal diagnosis of somatization disorder existed in the record (Tr. 940).

Dr. Paul Boyce, M.D., an internist, also testified at the hearing (Tr. 942-63). He reviewed the record and was present throughout Ms. Carroll's testimony (Tr. 942-43). In general, Dr. Boyce testified that evidence existed in the record of medically determinable impairments that could reasonably result in Ms. Carroll's symptoms (Tr. 943-51). But Dr. Boyce believed that Ms. Carroll could still perform light work with proper restrictions (Tr. 956). Such restrictions would include avoiding concentrated fumes, avoiding high humidity, and avoiding extreme temperatures, all of which could affect her respiratory impairments (Tr. 956).

5

Dr. Boyce did not support some of Ms. Carroll's treatment given the record (Tr. 959). Specifically, Dr. Boyce did not support the use of oxygen and pain injections in Ms. Carroll's treatment regimen (Tr. 959). Importantly, Dr. Boyce testified that while some somatization may be taking place, he deferred any assessments in that regard to mental health professionals (Tr. 959-60).

Michael Blankenship, a vocational expert, also testified at the administrative hearing (Tr. 963-67). The ALJ asked Mr. Blankenship to consider a "hypothetical individual of the age of 42 years, with a ninth grade education" with past relevant work the same as Ms. Carroll's work (Tr. 963). The ALJ also asked Mr. Blankenship to consider, within the hypothetical individual, a vocational profile limited to light work that entailed no climbing, avoided exposure to fumes and gases, and required no driving (Tr. 964). Mr. Blankenship testified that approximately 26,000 jobs existed within the Indiana economy that would provide relevant work to the hypothetical individual (Tr. 964-66).

## II.  The ALJ's Decision

After evaluating the record and hearing the testimony, the ALJ denied Ms. Carroll's claims using the five-step sequential evaluation. At step one, the ALJ determined that Ms. Carroll was not engaging in substantial gainful activity since her alleged disability onset date of March 1, 2002 despite her having worked part-time as a Wal-Mart cashier beginning in May 2002 and continuing through March 2003. The ALJ then found that Ms. Carroll satisfied step two because she had a combination of severe impairments, including chronic bronchitis, bilateral carpal tunnel syndrome, and degenerative changes in her cervical, thoracic, and lumbar spine (Tr. 23). At step three, however, the ALJ found that her impairments, considered alone or in

6

combination, did not meet or equal in severity any listed impairment in Appendix 1 to Subpart P of 20 C.F.R. § 404.

Before evaluating steps four and five, the ALJ determined that Ms. Carroll's residual functional capacity allowed her to perform tasks requiring light exertion in environments free of concentrated fumes, dust, gases, and other pulmonary irritants.  Accordingly, the ALJ moved to step four and, based on the residual functional capacity assessment, found that Ms. Carroll was unable to perform her past relevant work as a service station cashier.  Finally, the ALJ considered whether Ms. Carroll's residual functional capacity would allow her to perform work in the national economy.  Relying on testimony from a vocational expert, the ALJ found approximately 26,000 jobs existing within the Indiana economy capable of being performed by an individual with Ms. Carroll's functional capacity, and this meant that she was not disabled for purposes of the Social Security Act (Tr. 10-24).

The Appeals Council denied further review of the ALJ's decision (Tr. 5-8), and so the ALJ's decision is treated as the final decision of the Commissioner.  *See* 20 C.F.R. §§ 404.981 and 416.1481; *see also Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994).

### III.  Discussion

This Court's review of the Commissioner's decision is a limited one.  Unless there is an error of law, the Court will uphold the Commissioner's findings of fact if they are supported by substantial evidence in the record.  *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007) (citation omitted).  Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id*.  The ALJ must build a "logical bridge between the evidence and the result."  *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000).  In making a

7

substantial evidence determination, the Court will review the record as a whole, but will not reevaluate the facts, re-weigh the evidence, or substitute its own judgment for that of the Commissioner. *Id*.

With respect to credibility determinations, the Commissioner is in the best position to observe witnesses and make credibility determinations as long as those determinations have some support in the record. *Dixon v. Massanari*, 270 F.3d 1171, 1178-1179 (7th Cir. 2001). This Court will not disturb the weighing of credibility so long as the determinations are not "patently wrong." *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) (citation omitted).

There is a five-step inquiry in determining whether a claimant is disabled. *See* 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4). The ALJ must consider the applicant's claim in the following sequence:

> (1) whether the claimant currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether she can perform her past relevant work, and (5) whether the claimant is capable of performing any work in the national economy.

*Dixon*, 270 F.3d at 1176. "An affirmative answer leads either to the next step, or on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000) (citation omitted). A claimant will automatically be found disabled if she satisfies steps one, two, and three. However, "if a claimant satisfies steps one and two, but not three, then she must satisfy step four." *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995). The initial burden in steps one through four is on the plaintiff, and the burden shifts to the Commissioner only at step five. *Clifford*, 227 F.3d at 868 (citing *Knight*, 55 F.3d at 313).

Ms. Carroll advances three arguments in support of her request for reversal.  She argues that the ALJ erred by (1) not fully or fairly developing evidence as to an alleged pain disorder; (2) improperly assessing credibility by means of ignoring the psychological component of her pain disorder; and (3) denying her request for further psychological consultative examinations. While not explicitly stating so, all three of these arguments challenge the ALJ's determination of Ms. Carroll's residual functional capacity.  Ms. Carroll does not challenge that a person possessing the found residual functional capacity is capable of performing work in the national economy.  Rather, Ms. Carroll only argues that her residual functional capacity is more limiting than the ALJ determined because of her psychological pain disorder.  Each of Ms. Carroll's contentions will be addressed in turn.

        **A.**     **Development of Psychological Pain Disorder**

Ms. Carroll first asserts that the ALJ did not fully or fairly develop evidence as to an alleged pain disorder or somatization disorder diagnosed by Dr. Kenny as a possible mental impairment as required under 20 C.F.R. § 404.1529(b).  Specifically, Ms. Carroll argues that this pain disorder should have been characterized as severe in the second step of the sequential evaluation process.  But this is a stretch since all that Dr. Kenney said was that Ms. Carroll had "a pain disorder and an adjustment disorder with depression" (Tr. 22).  He never diagnosed somatization, and neither did anyone else (Tr. 940).  Ms. Carroll nonetheless argues that omitting the pain disorder as a severe impairment constitutes proof that the ALJ ignored any associated psychological symptoms in his determination of the functional capacity assessment.

First, the ALJ did recognize the existence of the pain disorder diagnosed by Dr. Kenny (Tr. 22).  He simply disagreed that this was evidence of somatization.  The ALJ noted, "[s]he

9

complains of depression and anxiety . . . but Dr. Kenny, a consulting psychologist who examined her in August of 2003, diagnosed only a pain disorder and an adjustment disorder with depression" (Tr. 22) (citations omitted).  This was not evidence of somatization (Tr. 940).  As a result, the ALJ concluded that "no allowance has been made in the claimant's RFC for mental impairments" (Tr. 22).  This demonstrates that the ALJ was aware of what Dr. Kenny had to say but did not conclude from it that Ms. Carroll was suffering from somatization.

The decision to exclude somatization from the RFC was amply supported.  The ALJ reviewed evidence from Dr. Jarmon, Dr. Gange, Dr. Boyce, Dr. Nelson, Dr. Baurele, Dr. Kochert, and Mr. Blankenship in reaching his conclusions.  For example, Dr. Jarmon reviewed the record and concluded "we don't really see very much in the . . . record in the way of indication of psychological problems" (Tr. 937), and he "didn't see the psychological problems as being primary in this case" (Tr. 938).  Dr. Jarmon did not view Dr. Kenney's assessment as being to the contrary (*Id*).  Dr. Jarmon testified that there is no formal psychological assessment of a somatization disorder in the record (Tr. 940), and that even if there were, there is nothing in the record to show that Ms. Carroll was incapable of performing unskilled work. The ALJ agreed with Dr. Jarmon (Tr. 22).

The ALJ also reviewed reports from two state agency psychologists, Dr. Gange and Dr. Evans.  Drs. Gange and Evans reviewed portions of the record, including Dr. Kenny's evaluation, before submitting reports to the ALJ.  Dr. Gange noted, "Dr. Kenny gave the DX of Pain Disorder, and Adjustment Disorder, with depression.  Dr. Kenny gave no medical opinion" (Tr. 353).  Dr. Gange concluded that Ms. Carroll was not suffering from a significantly limiting mental health impairment (Tr. 353).  Dr. Evans agreed with Dr. Gange's opinion (Tr. 353).

10

While Dr. Kenny did not have an opinion as to either the severity of Ms. Carroll's pain disorder or any limitations she suffered as a result of that condition, Dr. Jarmon, Dr. Gange and Dr. Evans did have such an opinion. And they all concluded that Ms. Carroll did not suffer from a significantly limiting mental health impairment (Tr. 22). The ALJ thus agreed with the assessment of the latter three doctors in excluding this from the RFC (Tr. 22).

The ALJ also took into account the testimony of Ms. Carroll's internist, Dr. Paul Boyce. Although Dr. Boyce testified that there was "some somatization taking place" (Tr. 959), he also was careful to note that he would "reserve that [determination] to a psychologist or a clinical psychologist, psychiatrist to formally make that diagnosis" (Tr. 959-960). Thus, his testimony regarding Ms. Carroll's somatization was effectively nullified by his later statement that he would prefer to leave that diagnosis to the mental health professionals.

It is clear that the ALJ examined all of the evidence before him and fashioned a logical bridge between the evidence and the result. There was good reason for the ALJ to not include somatization as part of the RFC. The ALJ cited several pieces of evidence from Dr. Jarmon and others to bolster his ruling. The mere presence of evidence that may support a different point of view does not necessitate a remand or reversal.

### B. Credibility Assessment

Ms. Carroll next asserts that the ALJ's credibility finding is flawed because the ALJ ignored the psychological component of pain underlying the pain disorder diagnosis of Dr. Kenny. Yet Ms. Carroll's brief is unclear as to how this claim actually undermines the credibility finding. The Court will not disturb the weighing of credibility so long as the determinations are not "patently wrong." *Prochaska*, 454 F.3d at 738.

11

The ALJ provided a litany of reasons that caused him to doubt Ms. Carroll's testimony. He noted that Ms. Carroll failed to follow doctor recommendations to stop smoking; that she feigned medical problems to acquire prescription drugs; that she falsely claimed that she had emphysema and falsely claimed that she was blind in her left eye; and that she engaged in skeptical behavior during medical testing (Tr. 21).  Ms. Carroll does not address any of these findings in her briefs.  Instead, Ms. Carroll seemingly argues that the psychological component of her claimed pain disorder justifies her behavior and consequently renders the ALJ's credibility finding incorrect.  But the ALJ is in the best position to observe witnesses and assess credibility. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).  The ALJ's considered and assessed Ms. Carroll's testimony and reasonably concluded that it was not fully credible.  There is nothing to indicate that the ALJ's credibility determinations were patently wrong.

### C. Request for Additional Consultative Examination

The record in this case was fully developed.  It is true that an ALJ has a duty to ensure that the record is fully and fairly developed and that it is complete. *Thompson v. Sullivan*, 933 F.2d 581, 585 (7th Cir. 1991).  But one could always ask for more evidence.  That is, there can always be one more doctor to be seen, one more test to be run.  But as the Seventh Circuit has stated this is "a formula for paralysis." *Kendrick v. Shalala*, 998 F.2d 455, 456-57 (7th Cir. 1993).  The ALJ is in the best position to know when enough is enough.

That's just what the ALJ did here.  The record spans nearly a 1000 pages and contains examinations from three psychologists – Dr. Kenny, Dr. Gange and Dr. Evans, and also the opinions of two medical experts.  Ms. Carroll's contention that more was needed is completely unsupported especially given breadth of the record in this case.  The ALJ concluded that the

12

record as a whole did not show any evidence of somatization.  The ALJ stated, "it doesn't indicate to me there's strong evidence that during the treatment process any of the treating sources, be they physicians, psychologists, anybody had a suspicion that that's what happened" (Tr. 962).

Ms. Carroll speculates that further examinations may help her develop a possible pain disorder and associated psychological underpinnings.  But conjecture does not warrant a remand. *Binion v. Shalala*, 13 F.3d 243, 246 (7th Cir. 1994) (citation omitted).  As long as the ALJ has enough evidence before him to make a disability determination that is supported by substantial evidence, the record is considered adequately developed.  *Nelson v. Apfel*, 131 F.3d 1228, 1235 (7th Cir. 1997).  This Court defers to the ALJ's judgment that the record has been adequately developed unless there is a demonstration that a "significant omission" exists within the evidentiary record.  *Luna*, 22 F.3d at 692.

At the hearing, upon denying the request for further examinations, the ALJ specifically recorded his concern that such requests could "make these cases go on forever" (Tr. 962).  This Court has no doubt that the voluminous record of this case was sufficiently developed to provide for substantial evidence supporting the ALJ's determination.

## IV. Conclusion

The ALJ's decision comports with the law and is supported by substantial evidence.  The decision of the Commissioner is **AFFIRMED**.

**SO ORDERED**.
ENTERED:  February 15, 2008

>                                s/ Philip P. Simon
>                                PHILIP P. SIMON, JUDGE
>                                UNITED STATES DISTRICT COURT